**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

**DENISE E. INGRAM,**

Plaintiff,

v.

**MICHAEL J. ASTRUE,** Commissioner of Social Security,

Defendant.

**No. 11-CV-3026-DEO**

**Memorandum and Opinion Order**

---

## I. INTRODUCTION AND BACKGROUND

This matter is before the Court pursuant to Denise E. Ingram's (Plaintiff's) Complaint, requesting disability benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401 et seq. Docket No. 2. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II. FACTS

Plaintiff meets the insured status requirements through June 30, 2012, and filed for disability on March 29, 2007, claiming an initial onset date of February 10, 2007. Plaintiff claims disability due to Septic Shock,[1] Type 2

[1] "Septic shock is a serious condition that occurs when an overwhelming infection leads to life-threatening low blood pressure. *Septic shock*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001689/, last visited September 25, 2012.

Diabetes,[2] and Hypoventilation Syndrome.[3] Tr. 16 and 84. The Commissioner of Social Security ("Commissioner") initially denied Plaintiff's claim on July 30, 2007. Tr. 84. Plaintiff's request for reconsideration was denied on November 15, 2007. Tr. 85. On August 4, 2009, Plaintiff appeared before a Social Security Administrative Law Judge ("ALJ"). Tr. 29-82. In a decision dated October 30, 2009, the ALJ denied Plaintiff disability. Tr. 9-25. On March 29, 2011, the Appeals Council denied Plaintiff's request for review. Tr. 1. On May 24, 2011, Plaintiff timely filed her Complaint with this Court. Docket No. 2.

Plaintiff was born on July 5, 1954. Tr. 84. At the time of the administrative law hearing, Plaintiff was 55 years old

---

[2] "Type 2 diabetes is a lifelong (chronic) disease in which there are high levels of sugar (glucose) in the blood. Type 2 diabetes is the most common form of diabetes." *Type 2 diabetes*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001356/, last visited September 25, 2012.

[3] Hypoventilation Syndrome "is believed to result from both a defect in the brain's control over breathing, and excessive weight (due to obesity) against the chest wall. This makes it hard for a person to take a deep breath. As a result, the blood has too much carbon dioxide and not enough oxygen. People with OHS [Obesity Hypoventilation Syndrome] are often tired due to sleep loss, poor sleep quality, and chronic low blood oxygen levels (hypoxia)." *Obesity hypoventilation syndrome (OHS)*, MedlinePlus, available at http://www.nlm.nih.gov/medlineplus/ency/article/000085.htm, last visited September 25, 2012.

and weighed 331 pounds while standing only 5 foot and 1/4 inches tall. Tr. 18. This places Plaintiff at a Body Mass Index (BMI) of 64.6. Id. A BMI of 30 or greater is considered obese, and a BMI of 40 or greater is considered extremely obese. Id.

Plaintiff was steadily employed at or around the substantial gainful activity (SGA)[4] level from 1984 to 2007. Tr. 156-60. Starting in 2003, Plaintiff began working as a telemarketer. Tr. 160. She last worked at the SGA level in 2004. Tr. 160 and 210. She suffered the illness precipitating her current disability claim on February 13, 2007. Tr. 40. In May of 2008, more than a year after the onset of her initial illness, Plaintiff returned to her job as a telemarketer, working part time below the SGA level. Id.

School records indicate Plaintiff had a recorded IQ of 69 in 3rd grade, 80 in the 6th grade, and attended special

[4] In order to qualify for disability, a Plaintiff may not be working at or above the SGA level. 20 C.F.R. § 404.1520(a)(4)(I). The question of whether a person is working at the SGA level is generally determined by the amount of money they earn at work, which varies according to inflation. 20 C.F.R. § 404.1574(a)(1). For instance, for 2011, the SGA level was $1,000.00 per month, for 2012, the SGA level is $1,010 per month. *Fact Sheet*, Social Security, available at http://www.socialsecurity.gov/pressoffice/colafacts.htm, last visited September 25, 2012.

education classes throughout junior high school.[5] Tr. 255-57. Plaintiff's employer at the telemarketing firm indicated Plaintiff had difficulty learning new programs. Tr. 285.

On February 17, 2007, Plaintiff's husband took her to the Mercy Medical Center in Mason City, Iowa. Tr. 196. Plaintiff was suffering from kidney stones and related septic shock. Tr. 196. Due to the severity of her condition, Plaintiff was placed in the intensive care unit and remained there until March 4, 2007. Id. On February 19, 2007, Dr. Levinson observed that Plaintiff had a right uteral stone with hydronephrosis[6] as well as a right renal cyst. Tr. 306. That evening, Dr. Levinson performed a cystoscopy[7] and implanted a stint. Id. On February 19, 2007, Plaintiff, because she was incapable of getting enough oxygen due to hypoventilation

---

[5] An average score for an I.Q. test is 100. "It is estimated that between 1 and 3 percent of the population has an [I.Q.] between 70 and 75 or lower. . . ." Atkins v. Virginia, 122 S. Ct. 2242, 2245 (2002) (citing A. Kaufman & E. Lichtenberger, Essentials of WAISIII Assessment 60 (1999)).

[6]Hydronephrosis refers to the "swelling" of a "kidney due to a backup of urine." *Unilateral hydronephrosis*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001535/, last visited September 25, 2012.

[7]"Cystoscopy is a test that allows your doctor to look at the inside of the bladder and the urethra using a thin, lighted instrument called a cystoscope." *Cystoscopy*, WebMD, available at http://www.webmd.com/a-to-z-guides/cystoscopy-16692, last visited September 25, 2012.

syndrome, was put on a respirator. Tr. 327. On February 26, 2007, Dr. Dettmer performed a tracheotomy,[8] due to Plaintiff's hypoventilation syndrome and related respiratory failure. Tr. 305. On March 13, 2007, Plaintiff was then transferred from the hospital to the Mercy Rehabilitation Unit where she stayed until March 21, 2007. Tr. 196. Once released, Plaintiff continued to be treated by an at home nurse. Id. The day after she was released, Dr. Pennington noted that the "tracheostomy should be considered permanent but could be evaluated again if substantial weight loss (at least 100 pounds) could be accomplished." Tr. 310.

On April 6, 2007, Disability Determination Services employee, P. Harris, conducted a phone interview with Plaintiff. Tr. 186-88. Mr. Harris specifically noted that Plaintiff breathed heavily at times during the interview. Tr. 188. Though Plaintiff was no longer required to be in the hospital or a rehabilitation facility, she still received

[8] "A tracheotomy is a surgical procedure that opens up the windpipe (trachea) . . . The term tracheostomy is sometimes used interchangeably with tracheotomy. Strictly speaking, however, tracheostomy usually refers to the opening itself while a tracheotomy is the actual operation." *Tracheotomy*, Encyclopedia of Surgery, available at http://www.surgeryencyclopedia.com/St-Wr/Tracheotomy.html, last visited September 25, 2012.

weekly home health care visits and was limited to going outside her home once a week. Tr. 196.

In a function report dated April 20, 2007, Plaintiff indicated her daily activities were limited to fixing meals for herself (generally, cereal and sandwiches), driving a car, talking on the phone, attempting to do light housework, and watching TV. Tr. 200 and 202. She required help bathing and had difficulty sleeping due to coughing spells and a need to use the restroom. Tr. 201. Her condition primarily affected her ability to talk. Tr. 205. She specifically noted that she does not talk for long periods of time because she will start coughing. Id. She thought she could walk maybe 60 feet without needing a rest, reported difficulty climbing stairs, could concentrate for up to an hour at a time, needed to read something multiple times before understanding it, and had difficulty understanding the spoken word. Tr. 205 and 207.

On May 30, 2007, Plaintiff saw Dr. Riesen in relation to pain in her foot. Dr. Riesen concluded Plaintiff suffered from degenerative joint disease in two of the joints in her left foot. Tr. 303. He also determined she suffered from Neuritis.[9] Id.

---

[9] Neuritis is “inflammation of one or more nerves. The characteristic symptoms of neuritis include pain and tenderness, impaired sensation, abnormal circulation and

In a disability report dated October 1, 2007, DDS employee, J. Franke, noted that Plaintiff reported being on a breathing machine at night. Tr. 223. She experienced sensitivity to smells, odors, and sprays and had difficulty breathing due to coughing episodes. Id. Plaintiff continued to require help showering and bathing. Tr. 226.

On July 30, 2007, Dr. Hunter, a Disability Determination Services (DDS) employee, completed a physical residual functional capacity assessment. Tr. 409-16. Dr. Hunter determined Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently, could stand and/or walk 2 hours in an 8 hour workday, could sit for a total of 6 hours in an 8 hour workday, and could push and/or pull 10 pounds occasionally and less than 10 pounds frequently. Tr. 410. Dr. Hunter also determined Plaintiff could climb stairs, balance, stoop, kneel, crouch, and crawl occasionally. Tr. 411. Despite Plaintiff's tracheostomy, Dr. Hunter determined Plaintiff had no communicative limitations, but she should avoid even moderate exposure to fumes, odors, dusts, gases,

---

decreased ability to sweat in the distribution of the inflamed nerve or nerves. Neuritis frequently results from injury of a nerve just underneath the skin." *neuritis*, Britannica Academic Edition, available at http://www.britannica.com/EBchecked/topic/410590/neuritis, last visited September 25, 2012.

poor ventilation, and hazards, such as machinery and heights. Tr. 413. On November 14, 2011, Dr. Wilson, also a DDS employee, concurred with Dr. Hunter's findings. Tr. 441.

In an adult function report, dated October 8, 2007, Plaintiff indicated her condition still prevented her from working outside her home. Tr. 232. Though she was performing a minimum amount of household maintenance, she was only able to do so in a piecemeal fashion. Id. She indicated her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, speak, and complete tasks. Tr. 236.

As previously noted, Plaintiff returned to work at a below SGA level in May of 2008. Plaintiff's employer, Nick Foley, signed a Declaration, dated June 2, 2009, relating to Plaintiff's work performance. The Declaration reads:

> Denise is very motivated and does her best but she has several difficulties doing her job. She . . . has difficulty acquiring the training for a short term program. More problematic, since her return to work following her hospitalization, Denise suffers from problems with involuntary noises from her tracheostomy and coughing attacks. These noises and coughing attacks are disturbing to her co-workers and to customers.
>
> Despite the complaints I have received regarding Denise's coughing and involuntary tracheostomy noises, I continue to provide her with some part-time hours out of

> compassion. I think it is important to provide some opportunities for work for the disabled in our community.
>
> I try to separate Denise from her co-workers as much as possible although this attempt at seating her apart from co-workers does not completely limit complaints.
>
> Although Denise has been spoken to about her coughing and involuntary noises it is our understanding that there is little that she is able to do to control these problems.

Tr. 285-86.

At the Administrative hearing of August, 2009, the Plaintiff referred to her part time work schedule as exhausting. Tr. 41. She also reported difficulty reading a newspaper and the need to re-read passages to understand them. Tr. 39. While on the phone at work, she was experiencing coughing spells and difficulty controlling her voice. Tr. 44 and 52. Though noting the coughing spells were unpredictable, when pressed by the ALJ, she guessed that she experienced 15 coughing spells a week in a 20 hour work week, and these coughing spells would last up to 2 minutes at a time. Tr. 45. She also testified that she could walk 5 minutes at a time before needing to rest and could carry, at most, 10 pounds. Tr. 48.

On November 20, 2009, post the ALJ hearing and the ALJ's decision but prior to the decision of the Appeals Council, Susan Faber, an Iowa Vocational Rehabilitation Counselor, wrote a letter to Plaintiff's counsel expressing her opinions related to Plaintiff's vocational outlook. Tr. 298-99. Ms. Faber determined Plaintiff was "most severely disabled . . . having limitations in mobility, self care, work tolerance and interpersonal skills." Tr. 298. She explained,

> Statistics from the Iowa Workforce Center indicate that Iowa's unemployment rate is 6.7 for October 2009 and 4.3 for October 2008. Denise participated in the GATB [General Aptitude Test Battery] . . . and her scores . . . revealed 93 in general intelligence, 92 in verbal ability, 102 in numerical ability, 83 in spatial perception, 110 in form perception, 104 in clerical ability, 83 in motor coordination, 88 in fine finger dexterity and 82 in manual dexterity. These aptitudes are then grouped to correspond to an occupational aptitude analysis and when this was performed on her scores she had no scores corresponding to any occupational area. Given the increasing unemployment statistics and her very limited ability to compete with other job seekers it is felt that her ability to obtain any other employment is unlikely locally or on a national level. From her own history it appears that her current employment situation is tenuous given her need to frequently cut customers off so they cannot hear her choking and also the carry over noise to other telemarketers and their customers is also annoying.

> This counselor knows of no other employer who would tolerate these interruptions in a work environment.
>
> Clearly[,] she is not functioning at substantial gainful activity at gross wages of $720 a month.

Tr. 299.

## III. THE ALJ'S DECISION

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to benefits. 20 C.F.R. § 404.1520. The five successive steps are: (1) determination of whether a plaintiff is engaged in "substantial gainful activity," (2) determination of whether a plaintiff has a "severe medically determinable physical or medical impairment" that lasts for at least 12 months, (3) determination of whether a plaintiff's impairment or combination of impairments meets or medically equals the criteria of a listed impairment, (4) determination of whether a plaintiff's Residual Functional Capacity (RFC) indicates an incapacity to perform the requirements of his past relevant work, and (5) determination of whether, given a Plaintiff's RFC, age, education and work experience," a plaintiff can "make an adjustment to other work." 20 C.F.R. § 404.1520(4)(i-v).

At step one, if a plaintiff is engaged in "substantial gainful activity" within the claimed period of disability, there is no disability during that time. 20 C.F.R. § 404.1520(a)(4)(i). The ALJ determined Plaintiff had not engaged in substantial gainful activity since her alleged onset date. Tr. 16.

At step 2, if a plaintiff does not have a "severe medically determinable physical or mental impairment" that lasts at least 12 months, there is no disability. 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ determined Plaintiff had the following severe impairments: obesity, diabetes mellitus, tracheotomy status post septic shock, chronic respiratory failure due to obesity hypoventilation syndrome, and degenerative joint disease of the left foot with neuritis. Tr. 16.

At step 3, if a plaintiff's impairments meet or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and last at least 12 months, a plaintiff is deemed disabled. 20 C.F.R. § 404.1520(e). The ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 17.

Before proceeding to step 4 and 5, the ALJ must determine a plaintiff's RFC. RFC is the "most" a person "can still do" despite their limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ determined Plaintiff had the following RFC:

> to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except she can never climb ladders, ropes, or scaffolds; she can only occasionally balance, stoop, kneel, crouch, and crawl; she can only rarely to occasionally climb ramps or stairs; she should avoid concentrated exposure to extremes of cold and heat, and to humidity, e.g., she cannot perform outdoor work. Additionally, the claimant should avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc. and to hazards, such as unprotected heights and moving machinery. Due to the effects of her tracheotomy such as fatigue, she cannot work fast-paced assembly line work but rather can perform goal-oriented work; and she would have an average of six unscheduled breaks per eight-hour workday of one to two minutes each (for a total of up to twelve minutes a day).

Tr. 17.

At step 4, if, given a plaintiff's RFC, a plaintiff can still perform their past relevant work, there is no disability. 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ determined that, based on the testimony of a vocational expert ("VE"), Plaintiff could do her job as a telemarketer at an SGA level, and, therefore, the ALJ did not proceed to step 5, i.e., whether, given Plaintiff's age, education, and work

experience, she could find another job in the national economy.

Plaintiff contends the ALJ erred in three respects: (1) the VE's testimony did not constitute substantial evidence on the record as a whole; (2) the ALJ improperly discredited Plaintiff's subjective allegations of pain; and (3) the RFC the ALJ assigned Plaintiff failed to account for all of Plaintiff’s limitations.

## IV. LAW AND ANALYSIS

In order for a plaintiff to qualify for disability benefits, they must demonstrate they have a disability as defined in the Social Security Act (the “Act”). The Act defines a disability as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. § 423(d)(1)(A).

### A. Standard of Review

This Court’s role in review of the ALJ’s decision requires a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Finch v. Astrue, 547 F.3d 933, 935 (8th

Cir. 2008). Substantial evidence is less than a preponderance but enough that a reasonable mind might find it adequate to support the conclusion in question. Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008) (citation omitted). This Court must consider both evidence that supports and detracts from the ALJ's decision. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) (citation omitted). In applying this standard, this Court will not reverse the ALJ, even if it would have reached a contrary decision, as long as substantial evidence supports the ALJ's decision. Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004). The ALJ's decision shall be reversed only if it is outside the reasonable "zone of choice." Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted).

This Court may also ascertain whether the ALJ's decision is based in legal error. Lauer v. Apfel, 245 F.3d 700, 702 (8th Cir. 2001). If the ALJ applies an improper legal standard, it is within this Court's discretion to reverse his/her decision. Neal v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005) and 42 U.S.C. § 405(g).

**B. The Vocational Experts Testimony: Whether Substantial Evidence Supported the ALJ's Decision that Plaintiff Could Perform Her Past Relevant Work**

The ALJ’s determination that Plaintiff could perform her past relevant work as a telemarketer at an SGA level was explicitly based on the testimony of a VE. Tr. 22. The regulations endorse VEs “as sources of occupational evidence . . . .” SSR 00-4p, 2 (citing 20 C.F.R. § 404.1566(e)). Typically, as in this case, VE evidence comes in the form of testimony given in response to a hypothetical about a person with the same RFC as the plaintiff in question.

After thoroughly reviewing the transcript of Plaintiff’s Administrative Hearing, this Court is persuaded the VE’s response to the ALJ’s hypothetical was, at best, contradictory and, more than likely, indicated Plaintiff was unable to perform her past relevant work at an SGA level. As such, the ALJ’s decision that Plaintiff could perform her past relevant work at an SGA level was not supported by substantial evidence on the record as a whole.

In the ALJ’s initial hypothetical to the VE, the ALJ failed to incorporate Plaintiff's need for unscheduled breaks due to coughing fits, which was included in the ALJ's final RFC determination. Tr. 70. The VE indicated such a hypothetical plaintiff would be able to function as a telemarketer on a full time basis. Tr. 70-71.

After this initial hypothetical, Plaintiff's Attorney raised the issue of Plaintiff's coughing fits and difficulty speaking due to her tracheostomy. Tr. 72-73. Plaintiff's Attorney then asked the VE to consider an individual with the same limitations as in the first hypothetical but also with a need to take 12 minutes per work day of unscheduled time to cough. Tr. 74.

The VE responded, "[w]ell I suppose, with that amount of time, at some point, productivity would be an issue, and the individual may not keep the job." Tr. 75. The ALJ then rephrased the same substantive question, and the VE altered his response to the following:

> I'm still going to say yes [they would be able to perform the job of telemarketer], because the 12 minutes out of the day could be considered part of the normal break time of 15 minutes in the afternoon, 15 minutes in the morning . . . If you were talking about, you know, the individual was taking their 15 minutes break, then . . . there may come a time . . . when productivity would be an issue.

Tr. 75-76.

The Plaintiff's Attorney then correctly pointed out that the question did not hinge on how much time a person would need to break during the day, but rather, on how often and for how long a telemarketer could, on an unscheduled basis,

interrupt his or her work to have coughing fits. Tr. 76. Plaintiff's Attorney then stated,

> So I would like you to add to the hypothetical question the consideration that it be . . . up to 12 minutes a day of interruption . . . not just a separation from the work time, but an intrusion into the conversation with a customer. Would it then be inconsistent with the job qualifications of a telemarketer?

Tr. 76.

The VE then responded,

> Well . . . I would not recommend that job for someone that has difficulty talking. However, it depends on the employer. I can't say what each employer's qualifications are for the job of telemarketing. The Dictionary of Occupational Titles requires that talking is frequent. If that is consistent with the employer and the individual has difficulty talking frequently, then they would not be qualified for that job.

Tr. 77.

Clearly, the VE's testimony was, at best, contradictory, and, more than likely, the VE indicated Plaintiff would not be able to perform her past relevant employment at an SGA level given the limitations explicitly found by the ALJ.

In addition, while an ALJ may rely on testimony from a VE, the regulations also provide that an ALJ shall "take administrative notice of 'reliable job information' available"

in authoritative publications, including the Dictionary of Occupational Titles ("DOT"), compiled by the Department of Labor. SSR 00-4p, 2 (citing 20 C.F.R. §§ 404.1566(d) and 404.1566(e)). "When there is an apparent unresolved conflict between a VE . . . and the DOT," an ALJ must elicit a reasonable explanation for the conflict before relying on the VE . . . to support a determination . . . about whether a claimant is disabled." SSR 00-4p, 2.

The DOT provides that a telephone solicitor is generally able to "speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice." DOT, Appendix C, available at http://www.occupationalinfo.org/appendxc_1.html, last visited September 25, 2012, and DOT 299.357-014. These skills obviously conflict with someone with a tracheostomy who must pause to cough up to six times a workday for 1 to 2 minutes each time. While the ALJ did ask the VE whether there was a conflict between his testimony and the DOT, and the VE perfunctorily responded no, the VE more than likely responded this way because he ultimately determined telemarketing was "the wrong job" for someone with Plaintiff's limitations. Tr. 80. Even if this Court is mistaken in characterizing the VE's ultimate response as negative, at no time did the VE provide a reasonable

explanation for the obvious conflict between a positive response and the DOT.

**C. Whether the ALJ Decision to Discredit Plaintiff’s Subjective Allegations was Based on Substantial Evidence on the Record as a Whole**

An ALJ must consider lay observations of a Plaintiff’s limitations, including limitations attributable to a Plaintiff’s subjective accounts of pain or other symptoms. 20 C.F.R. § 404.1545(a)(3). Based on the general substantial evidence on the record as a whole standard of review, a District Court should defer to an ALJ’s determination that a plaintiff’s allegations lack credibility “as long as the ALJ explicitly discredits a [plaintiff’s] testimony and gives a good reason for doing so.” Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (quotation omitted).

In Polaski v. Heckler, the Eighth Circuit ruled that, in considering a Plaintiff’s allegations, the ALJ must consider the Plaintiff’s “prior work record” and “observations by third parties and treating and examining physicians relating to such matters as:”

> (1) the claimant’s daily activities;
> (2) the duration, frequency and intensity of the pain;
> (3) percipitating and aggravating factors;

> (4) dosage effectiveness and side effects of medication; [and]
> (5) functional restrictions

751 F.2d 943, 948 (8th Cir. 1984).

The ALJ discounted Plaintiff's subjective allegation of disabling limitations on the following bases: (1) Plaintiff's daily activities were inconsistent with Plaintiff's subjective allegations; (2) the surgery Plaintiff underwent was generally successful in relieving Plaintiff's symptoms; (3) treating doctors did not assign functional limitations to the Plaintiff; (4) during the hearing, Plaintiff did not exhibit any difficulty speaking or discomfort; (5) statements from claimant's work supervisor that Plaintiff was able to do her job, despite her limitations, undermined her credibility; and (6) opinions of the state agency medical consultants did not support Plaintiff's subjective allegations. Tr. 21-22.

As previously noted, Plaintiff indicated her daily activities were limited to fixing meals for herself (generally cereal and sandwiches), driving a car, talking on the phone, attempting to do light housework, and watching TV. Tr. 200 and 202. Plaintiff also indicated she required help bathing. Tr. 201. Apparently, the ALJ felt these activities were indicative of a person able to perform full-time work on a competitive basis in the national economy; this Court

disagrees. A plaintiff's account of simple, routine daily activities is not incompatible with a plaintiff's "contention that she is unable to hold a full time job." Ford v. Astrue, 518 F.3d 979, 983 (8th Cir. 2008). "[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995). "[I]t is well settled law that a 'claimant need not prove she is bedridden or completely helpless to be found disabled.'" Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

As previously noted, on February 17, 2007, Plaintiff's husband took her to the Mercy Medical Center in Mason City, Iowa. Tr. 196. The ALJ correctly notes that the surgical procedures and Plaintiff's extended stay in the hospital and rehabilitation center resulted in the resolution of her kidney stones and related septic shock, and her tracheostomy allowed her to get off a respirator, but it is not apparent how this undermines Plaintiff's credibility; these conditions simply are not at issue. Plaintiff has never maintained that she is still suffering from kidney stones and septic shock. It is clear Plaintiff's limitations result from her obesity, joint

problems, and Hypoventilation Syndrome, including her tracheostomy, not the medical emergencies that required Plaintiff to be hospitalized.

The ALJ's contention that Plaintiff lacks credibility because her treating doctors never assigned functional limitations is also unpersuasive. The Plaintiff's treating physicians were concerned with saving Plaintiff's life, not her future ability to return to work. Plaintiff's kidney stones resulted in potentially life threatening kidney swelling and septic shock. In addition, Plaintiff's Hypoventilation Syndrome became severe enough for Plaintiff to require a ventilator in order to breathe while simply lying in bed. It is neither surprising, nor uncommon, for doctors not to comment on a plaintiff's functional capabilities in such situations; Plaintiff was, after all, bed-ridden, and so her functional capabilities were apparent. Even after released, she was visited by a home health care provider weekly. It is obvious that an extremely, morbidly obese 55 year old person with a tracheostomy related to hypoventilation syndrome and joint problems will have serious limitations related to mobility, strength, fatigue, and communication. Plaintiff’s treating physicians were interested in treating Plaintiff, not elaborating upon obvious limitations.

The ALJ's contention that Plaintiff did not exhibit any difficulty speaking or discomfort during the Administrative Hearing does not undermine Plaintiff's credibility. The videoconferencing technology utilized during the hearing required Plaintiff to push a button before she could be heard, and the ALJ indicated Plaintiff reported coughing when the button was not depressed. Rather than relying on his observation during a mere one hour and twenty minute hearing, it would have been far more reasonable for the ALJ to consider the Declaration from Plaintiff's supervisor. The Declaration states Plaintiff "suffers from problems with involuntary noises from her tracheostomy and coughing attacks," which "are disturbing to her co-workers and to customers." Tr. 285. Clearly, Plaintiff's supervisor, who observed Plaintiff 20 hours a week, was in a much better position to corroborate or negate Plaintiff's testimony related to her involuntary noises and coughing fits, and the ALJ's observations do not constitute substantial evidence on the record as a whole. See SSR 96-8p, 6 ("In instances in which the adjudicator has observed the individual, he or she is not free to accept or reject that individual's complaints *solely* on the basis of such personal observations.")

The ALJ’s contention that Plaintiff's supervisor's statements undermine her credibility is a case of selective editing. Upon reviewing Plaintiff's supervisor's Declaration, this Court is persuaded that it corroborates, rather than detracts, from Plaintiff's credibility. In pertinent part, the Declaration states, "I continue to provide her with some part-time hours out of compassion. I think it is important to provide some opportunities for work for the disabled in our community." Tr. 285. It is clear from the supervisor's statements that Plaintiff was not doing the work expected of other employees and would not be able to compete with others seeking full-time employment. "Work in [a] sheltered" environment "is not substantial evidence supporting a denial of disability benefits" Van Horn v. Heckler, 717 F.2d 1196, 1999 (8th Cir. 1983). While Plaintiff's current part-time employment indicates Plaintiff can do, and actually is doing, her past relevant work in a sheltered environment, this does not somehow undermine her credibility in relation to her allegations that she is incapable of working on a full-time basis. Finally, the Plaintiff has never contended that she cannot perform her job on a part-time basis, and so it is unclear how this undermines her credibility.

As to the ALJ's contention that the opinions of the state agency medical consultants undermine Plaintiff's credibility, it should first be noted that Plaintiff's subjective allegations only vary from the state agency medical consultants’ opinions in a handful of respects. She contends she has communicative limitations and issues with fatigue, and the state agency medical consultants failed to mention or consider these limitations. Since there is no information on record directly contradicting, or even undermining, the Plaintiff's subjective allegations, outside of the opinions of the state agency medical consultants, and there is plenty of evidence supporting Plaintiff’s allegations, it is unclear how the state agency medical consultant opinions can serve to undermine Plaintiff’s credibility; after all, these state agency medical consultants were non-examining physicians who were literally incapable of making additional substantive observations of the Plaintiff’s abilities or limitations. Non-examining medical consultants are specialists in synthesizing medical evidence for vocational purposes, and, because they never meet or observe the plaintiff in question, are not in a position to undermine a plaintiff's credibility in relation to his/her subjective allegations so long as those allegations could reasonably be expected to arise from the

plaintiff’s documented impairments; only when a plaintiff's subjective allegations are inconsistent with the medical impairments or relevant observations of record is a non-examining consultant in a position to undermine the credibility of a Plaintiff's subjective allegations. As previously noted, Plaintiff suffers from Hypoventilation Syndrome, morbid obesity, and has a tracheostomy, and these conditions are obviously consistent with Plaintiff's subjective allegations of fatigue and communication problems. In addition, the record contains notes from a DDS employee stating Plaintiff breathed heavily throughout a phone interview, and Plaintiff's Supervisor's Declaration indicates Plaintiff makes disturbing noises and has coughing fits due to her tracheostomy on a regular basis.

In conclusion, Plaintiff has consistently reported her limitations, and those limitations are entirely consistent with the remainder of the record reasonably capable of supporting or detracting from those allegations. Therefore, the ALJ's determination that Plaintiff was only partially credible is not supported by substantial evidence on the record as a whole, and, as such, the ALJ's credibility determination constitutes clear error.

**D. Whether the RFC the ALJ Assigned Plaintiff Failed to Account for All of Plaintiff's Limitations**

An ALJ’s RFC assessment is crucial for determining whether a plaintiff is disabled. It has been referred to as the “most important issue in a disability case . . . .” Malloy v. Astrue, 604 F. Supp. 2d 1247, 1250 (S.D. Iowa 2009) (citing McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982)(en banc)). A plaintiff’s RFC is a function-by-function assessment of the most a plaintiff can still do despite his or her impairments. S.S.R. 96-8P, 1. When determining RFC, the ALJ must consider all of a plaintiff’s impairments, even those which are not deemed severe, as well as limitations which result from symptoms, such as pain. § 404.1545(a)(2) and (3). RFC is “not the ability merely to lift weights occasionally in a doctor’s office . . . it is the ability to perform the requisite physical acts . . . in the real world.” 604 F. Supp. 2d at 1250 (quoting 683 F.2d at 1147).

In this case, the ALJ overlooked some of Plaintiff's important functional limitations. For instance, though the ALJ recognized Plaintiff would have to take up to 6 unscheduled breaks per day for 1 to 2 minutes at a time due to coughing fits, the ALJ failed to assign limitations related to Plaintiff's problems controlling her voice and her propensity

to make inadvertent noises her Supervisor characterized as "disturbing." Tr. 285. In the real world, where many jobs require social interaction, involuntary noises are real limitations, clearly affecting an individual's employability.

In addition, though the ALJ recognized Plaintiff became fatigued because of her tracheostomy, he only indicated this prevented her from "fast-paced assembly line work." Tr. 17. Plaintiff indicated that she could only walk for five minutes before needing to rest and had difficulty climbing the small amount of stairs leading from her sidewalk to her front door. Plaintiff also testified that her then part-time work schedule was exhausting, and she had difficulty sustaining efforts to complete common, simple household chores. A two-dimensional understanding of fatigue views it as something which causes discrete exertional limitations, such as an inability to do fast paced assembly line work; a three-dimensional understanding recognizes that fatigue builds throughout a day, exacerbating all of an individual's pre-existing functional limitations as the day wanes. It is not difficult to understand how Plaintiff, an extremely, morbidly obese women with a medical condition that prevents her from getting enough oxygen would be incapable of sustaining any work-related activity for 8 hours a day, 5 days a week.

Finally, the ALJ failed to account for Plaintiff's limited intellectual abilities. As previously noted, in 3rd grade, Plaintiff scored 69 on an IQ test, and, in the 8th grade, she scored an 80. The record also indicates Plaintiff attended special education classes in junior high school. More recently, Plaintiff reported that she could only concentrate for up to an hour at a time, needed to read something multiple times before understanding it, and had difficulty following the spoken word. Plaintiff's supervisor corroborated Plaintiff's allegations by indicating that Plaintiff had "difficulty acquiring training for short term program[s]." Tr. 285.

The ALJ's failure to account for Plaintiff's well established and undisputed mental limitations is significant. A telephone solicitor's (telemarketer’s) abilities, along with the ability to “[s]peak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice,” includes the ability to “[r]ead a variety of novels, magazines, atlases, and encyclopedias;” and an ability to “[w]rite reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech.” *Appendix C: Components of the Definition Trailer*, DOT Dictionary of Occupational Titles, available at

http://www.occupationalinfo.org/appendxc_1.html#GOE, last visited September 25, 2012. While this Court recognizes the DOT outlines the maximum requirements for each position, the Plaintiff's educational background and testimony related to her learning abilities places her well below the levels outlined in the DOT.

Overall, the RFC the ALJ assigned to Plaintiff failed to account for a number of Plaintiff's limitations.

**V. CONCLUSION**

It is clear the ALJ erred in several respects. In particular, at step four of the sequential evaluation process, the ALJ erroneously relied on the testimony of a VE though that testimony was, at best, contradictory and, more than likely, indicated Plaintiff was incapable of performing her past relevant work at an SGA level. The VE's testimony also clearly conflicted with the DOT, and the ALJ failed to elicit a reasonable explanation for the contradiction. In addition, the ALJ's decision to give Plaintiff's subjective allegations limited weight was not supported by substantial evidence on the record as a whole. As previously noted, Plaintiff has consistently reported the manner in which her impairments affect her functional capacity, and the record simply does not reasonably undermine her allegations. Finally, the RFC the

ALJ assigned Plaintiff failed to incorporate a number of the Plaintiff's limitations, including her difficulty controlling her voice, her propensity to make involuntary noises, her fatigue, and her well established mental limitations.

The question thus becomes whether this Court should remand for further consideration or solely for the purpose of awarding benefits. This Court has the authority to reverse a decision of the Commissioner, "with or without remanding the cause for rehearing," but the Eighth Circuit has held that a remand for award of benefits is appropriate only where "the record 'overwhelmingly supports'" a finding of disability. 42 U.S.C. 405(g); Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000) (citing Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992)). A remand for further findings, rather than an award of benefits, is typically appropriate when the ALJ makes his or her decision to deny disability at step four of the sequential evaluation process and does not reach step five.

However, as previously noted, after the ALJ issued his decision, Susan Faber, a Vocational Rehabilitation Counselor, met with and conducted a battery of aptitude tests on Plaintiff. In pertinent part, Ms. Faber indicated Plaintiff was "most severely disabled . . . having limitations in mobility, self care, work tolerance and interpersonal skills."

Tr. 298. Ms. Faber concluded that, "[g]iven the increasing unemployment statistics and [Plaintiff's] very limited ability to compete with other job seekers[,] it is felt that her ability to obtain any other employment is unlikely locally or on a national level." Tr. 299.

Considering Ms. Faber's opinion, as well as well as Plaintiff's credible subjective allegations and established functional limitations, this Court is persuaded the record overwhelmingly supports a finding that Plaintiff is incapable of performing any work in the national economy at an SGA level. **Therefore, the Commissioner's decision is reversed and remanded solely for the calculation of benefits from the date of Plaintiff's claimed onset of disability, February 10, 2007.**

Application for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (EAJA), must be filed within thirty (30) days of the entry of final judgment in this action. Thus, unless this decision is appealed, if Ingram's attorney wishes to apply for EAJA fees, it must be done within thirty (30) days of the entry of the final judgment in this case.

**IT IS SO ORDERED** this 26th day of September, 2012.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa